1
2
3
4

# UNITED STATES DISTRICT COURT

5

EASTERN DISTRICT OF CALIFORNIA

6
7

8   YVONNE HILTON,                                    Case No. 1:12-CV-001360-SMS

9                          Plaintiff,

10        v.                                          ORDER DENYING DEFENDANTS'
                                                      MOTION FOR SUMMARY JUDGMENT.
11   TWAIN HARTE COMMUNITY
     SERVICES DISTRICT; AND DOES 1-20,
12   INCLUSIVE,

13                         Defendants.                (Doc. 29)

14

15        Plaintiff Yvonne Hilton ("Hilton") filed this action against her former employer the Twain

16   Harte Community Services District ("Twain Harte" or "the District") and Does 1-20, (collectively,

17   "Defendants"), alleging that Hilton experienced a hostile work environment due to severe and

18   pervasive sexual harassment, as well as gender discrimination and retaliation.  Hilton contends that

19   by their actions, former Board members Dennis Spisak, Bill Bryant, and District managers violated

20   California's Fair Employment and Housing Act ("FEHA").  Before the Court in the above-styled

21   and numbered cause of action are Defendants' "Motion for Summary Judgment / Adjudication,"

22   filed April 14, 2014 (Doc. 29), Plaintiff's Memorandum of Points and Authorities in Opposition to

23   Defendant's Motion for Summary Judgment / Adjudication, filed April 30, 2014 (Doc. 45), and

24   Defendant's Reply Memorandum of Points and Authorities in Support of Motion for Summary

25   Judgment / Adjudication, filed May 7, 2014 (Doc. 46).  The Court, having considered the record in

26   this case, applicable law, and parties' briefs, will deny Defendant's motion.

27
28
                                                    1

**BACKGROUND**

I.     **Plaintiff's Facts**[1]

Hilton, a 52-year-old Caucasian female, was an employee of Twain Harte Community Services District ("the District") from September 5, 2000 through June 17, 2011.

<u>Hilton's Employment History with the District</u>

When Hilton started at the District in September 2000, Carole Reyes ("Reyes") was the District's controller and Don Kasso ("Kasso") was its general manager.  Hilton's first position was as the District's part-time receptionist.  After approximately three months, Hilton transitioned into being a full-time customer service representative.  Early in Hilton's tenure at the District, because Reyes was planning to retire, Reyes and Kasso asked her to train to replace Reyes as controller, which Hilton did for approximately three years.

In 2005, the District's Board approved Hilton as controller.  From November 2005 through her termination, Hilton was employed as the District's controller (later titled "finance director"), a management-level position.  As such, her responsibilities included preparing budgets, ensuring that the District complied with the Brown Act and conflict of interest issues, attending and making reports at Board of Directors' ("the Board") and committee meetings.  Hilton also acted as secretary of the board.  In that capacity her duties included preparing agendas for and taking minutes at Board meetings.  For the duration of her employment, Hilton was the only female manager employed by the District.  Hilton contends that at all times, she performed her job satisfactorily.

In 2008, the District terminated its then general manager, Michael Stacher ("Stacher"). The position was vacant for six months.  At the direction of the Board, Hilton assumed the general manager's duties for the period between Stacher's termination and when the District hired Scot Moody as general manager.  Hilton was not compensated for undertaking those additional duties.

---

[1] The Court takes the factual background from the facts as alleged in Plaintiff's Complaint, unless otherwise noted.

2

Hilton applied for the general manager position, but was told by Board member Bryant that the District "needed a man in charge." Hilton complained to Moody that she should have been compensated for her extra duties. Moody expressed agreement, but took no action.

Office Culture

Hilton alleges that the culture at the District fostered gender discrimination. As an example, she notes that the District operations manager referred to the female office staff as "skirts." District Fire Chief McCoy told Hilton that her husband needed "to get control of her." At some point, the District changed Hilton's job title from "Controller" to "Finance Director." Board Member William Bryant explained to several managers that one reason for changing Hilton's title was that they needed to "control the controller." Moody told Hilton that she was required to raise her hand to speak at meetings, whereas male managers were not required to do so. At all times during Hilton's employ at the District, she was the only female manager except for Carol Reyes, whom Hilton had replaced.

Hilton received some formal performance reviews during the time of her employment with the District. Hilton received her best performance review on July 5, 2006, the result of which was a 4.2 rating out of a possible five. During Moody's tenure as general manager, he never gave Hilton a formal review. When Hilton asked Moody if he would conduct one, he told her that she was doing so well that it was unnecessary. In December 2010, Hilton heard from RaeLene Brown (an official with the union who was possibly going to represent the workers at the District), that Moody was building a case to terminate Hilton.

Hilton's Internal Complaints

In her allegations, Hilton also catalogues her early experience with sexual harassment at the District. In 2002-03, Dennis Spisak ("Spisak") was a member of the District's Board. Hilton alleges that during this time she was the victim of sexual harassment as a result of Spisak's conduct.

Hilton alleges that while in the office of the District, Spisak put his hands on Hilton's shoulders and whispered, "I would love to sleep with you."  Spisak invited Hilton to come to his house for sex while his wife was at work.  He asked Hilton to meet him at a corner after a Board meeting.  When Spisak was in the office, he grabbed Hilton and tried to kiss her.

In 2003, Hilton filed a complaint with the District against Spisak.  Spisak threatened Hilton with her job for complaining about the incidents to the general manager.  As a result of the investigation into the alleged sexual harassment, the District asked Spisak to resign from the Board, which he did.  As part of the settlement, Spisak agreed to avoid contact with Hilton.

Despite resolution of the 2003 sexual harassment complaint, Hilton alleges that Spisak continued his violative conduct.  Hilton contends that from the time of Spisak's Board resignation through June 16, 2011 (the day before Hilton was terminated), Spisak made regular visits to the District's offices.  He visited to pay his bill, introduce himself, chat with employees, and chat with the general manager.

When Kasso was general manager, Spisak would visit his office to chat.  Hilton alleges that during those visits, Spisak pointedly attempted to engage her in conversation and she would complain to Kasso about Spisak's conduct.  Kasso told Hilton that he could not keep Spisak out of the District office because it was a public building.

When Stacher became general manager, Spisak came by to see him on a regular basis. Hilton expressed her discomfort to Stacher, but Stacher took no preventative measures to protect Hilton from the unwanted attention.  On several occasions, Spisak visited Pete Kampa's office to chat.  Hilton asked to be protected from Spisak, but was told she would have to file and pay for a restraining order against him.

Later, when Moody was general manager, Hilton complained to him about Spisak's conduct and ongoing efforts to engage in contact with her.  Hilton told Moody how contact with Spisak

caused her to begin shaking, crying, and become nauseated.  Moody responded that he was powerless to stop Spisak's visits "because it's a public agency that [Spisak] can come in whenever [he] want[s]."  On one occasion, Spisak brought a local political candidate, Evan Royce, to the District office.  Spisak came to Hilton's office and introduced Royce to Hilton.  Hilton complained to Moody about the incident.  Moody did not substantively respond to Hilton's complaint, but said, "why didn't [Spisak] introduce the new candidate to me?"  Spisak continued to visit the District office.  On these occasions, he rapped on Hilton's window and attempted to engage her in conversation in the parking lot, he also attempted to stop her while she was walking to her car or into the office.  Hilton complained about this perceived harassment to Moody.  Moody responded that there was nothing he could do.

In 2009, William Bryant ("Bryant") was a member of the District's Board.  Hilton alleges that during this time she was the victim of gender discrimination as a result of Bryant's conduct.  Bryant insisted that she not be allowed to attend a business conference, despite an existing budget approving it.  Bryant had never complained about any of the male managers attending conferences.  Hilton took her complaint to Moody, who told her that she would have to file a formal grievance.

In August of 2009, Hilton did file a formal grievance against Bryant, then a current Board member.  Hilton alleged years of what she perceived as discrimination and harassment by Bryant because of her gender.  The District commenced an investigation, led by Dennis Timoney ("Timoney") of SDRMA.  Timoney's report "support[ed Hilton's] allegation that she was subject to harassing conduct by Director Bryant . . . ."  Timoney found that Bryant had engaged in harassing conduct and that he had discriminated against Hilton on the basis of her gender.  At the close of the investigation, Timoney offered to conduct discrimination and harassment training for the directors, free of charge.  Hilton encouraged Moody to take advantage of the training opportunity, but detected that Moody was irritated with the request.  The Board never conducted any such training.

As a result of Timoney's investigation, the District's insurance company advised Bryant to resign his Board position, which he did in October 2009.

Despite Bryant's resignation, from that time until shortly before Hilton was terminated, Bryant was a regular visitor to the District's offices. During those visits he attempted to engage Hilton's receptionist in lengthy conversations. Bryant would also spend lengthy visits with Moody, whose office door Hilton shared. Bryant attempted to "chat [Hilton] up." Hilton complained to Moody, sharing with him that Bryant's visits caused her to begin shaking, crying, and become nauseated. Hilton asked Moody if he could stop Bryant from coming to the office. Moody responded that nothing could be done to stop Bryant "because it's a public agency that [he] can come in whenever [he] want[s]."

Hilton continued to request that Moody protect her from Spisak and Bryant. Over the course of 2011, her last year with the District, she had conversations with Moody about her perceived harassment. In her final six months at the District, those conversations became more frequent. In response, Moody told Hilton that he would speak with Spisak and Bryant. Hilton believes that Moody never took any action because the alleged harassment continued.

<u>Plaintiff's Interactions with the Board of Directors</u>

As part of her job responsibilities, Hilton attended District Board meetings. As her job required it, she was more familiar with Brown Act compliance requirements than Moody or the Board, though the Board and employees had a shared responsibility to comply with the Act. During Board meetings Hilton was most vocal about Brown Act compliance. Either Hilton's actions giving compliance recommendations or the style in which she did so seemingly annoyed Moody and the Board. Moody expressed to Hilton that he was not annoyed about her interjecting at Board meetings, rather, he objected to the forcefulness with which she did it. Moody told Hilton that, despite her role as Finance Director, Board members had told him that unless spoken to,

Hilton should not speak at Board meetings.  On one occasion, Moody told Hilton that to speak at Board meetings she was required to raise her hand.  Male managers were not so required.

At a finance meeting in March 2010, committee members excused Hilton – still the Finance Director – from the ongoing meeting.  After the meeting, Hilton asked Moody why she had been asked to leave.  He replied, "that's so the men could talk."  Repeatedly, and again on this occasion, Hilton complained to Moody about her inferior treatment at the hand of the Board and about how other female staff were treated based on their gender.  Moody told Hilton to be aware that a director "might" tell Moody to "write a check for any sum of money to get rid of [Hilton]."  Hilton understood this as a threat to terminate her because she complained about gender discrimination.

Also in 2010, Hilton was involved in an incident at the office with a District customer.  The customer had become belligerent with the receptionist.  Hilton came to provide assistance to the staff member.  When Hilton got involved the customer was rude, began yelling, and swore at her.  The customer subsequently complained to Maxwell and Johnson, who were not present at the time of the incident.  No investigation followed.  Moody wrote a letter to the male customer, telling him that if he came to the District office, he was allowed to speak to Moody and no one else.  Based on that letter, Hilton believed that even if Moody could not prohibit the public from entering the building, he did have control over what a member of the public could do while inside the building.

In May 2011, Hilton send an email to Director Gordon Molloy clarifying a Brown Act issue and requesting that all work asked of her staff come through her first.  Prior to sending that e-mail, Hilton had sent it to Moody for approval.  Moody approved the e-mail, but warned Hilton to "be careful of Gordon [Malloy, a Board member]. He doesn't like to be told what to do by a woman."

At a Board meeting on June 9, 2011, Hilton responded to a Board member's question.  During her response, the current President of the Board, Packy Maxwell ("Maxwell"), interrupted Hilton and spoke over her.  Another Board member, James Johnson, looked at Hilton and made a

"slicing" gesture at her, by which she understood he meant "shut up."  Hilton had had a similar experience at a previous Board meeting, when then Board member Bryant had directed the same gesture at her.  She never saw a Board member direct such a gesture at any male manager, nor had she witnessed a male manager being interrupted in a similar context.

Hilton's Termination: June 17, 2011

On the afternoon of June 16, 2011, Spisak visited the office and tried to engage with Hilton. Since Moody was out of the office that afternoon, Hilton spoke with Moody the next morning, June 17, 2011, and expressed to him how Spisak had upset her.  That same afternoon, Moody terminated Hilton.  Moody supplied Hilton no justification for the decision.

Severance and Benefit Payments

Other manager-level employees had been terminated in 2011 and they had all received payment for their accumulated sick days and other benefits.  Hilton came to know this because in her role as financial officer, she had written a severance check which included accumulated sick pay to Paul Krawchuk's ("Krawchuck") when he had been terminated.  The District had terminated Krawchuk because it determined that he had engaged in business dealings which constituted conflicts of interest and he had also made inappropriate jokes concerning race.  Krawchuk received three months' severance pay.  Hilton contends that it was Moody's idea to offer Krawchuk a severance package, and that he did so without Board approval.

In addition to all accumulated sick leave, Hilton contends that male managers terminated by the District had received vacation, medical insurance, and retirement pay.  For example, during the relevant period in 2011, Ernie McCoy ("McCoy") was the District's Fire Chief, a position he took some time after Hilton had been promoted to Controller.  In March 2011, a few months before the District fired Hilton, the District also fired McCoy.  They did so as a result of his misconduct mistreating employees, taking money from a fundraiser and counting it behind closed doors, taking

donated items for personal use, and possible embezzlement.  The District allowed McCoy to negotiate a severance package.  Ultimately, as severance, the District gave McCoy eight (8) months of reduced salary so that he would remain eligible for and become fully vested in CalPERS on December 31, 2011.  In another instance, the District moved to terminate Scott Hastings, an operations manager.  As an alternative to termination, the District offered Hastings a demotion within the District so he could remain employed, although Hastings declined the demotion.

Hilton was due to become fully vested in CalPERS on December 31, 2011, approximately six months after her termination date.  The District did not pay Hilton for her accumulated sick days, offer her a severance package or the opportunity to negotiate for one, did not offer her an opportunity to remain employed in another position at the District, nor did the District give her the option to resign.  Hilton alleges that immediately after Moody terminated her, the District gave him a salary increase.  On approximately July 5, 2011, approximately three weeks after her termination, the District held a *Skelly* Hearing meant to resolve Hilton's claim of wrongful termination. Generally, administrative committee members would preside over such a hearing.  The District's Board administrative committee consisted of Johnson and Malloy.  At Hilton's hearing, Board members Johnson and Maxwell presided and the District presented no evidence against Hilton. The District recorded the hearing, but subsequently destroyed its recording.

## II.    Procedural Background

Hilton filed a complaint against the District with the California Department of Fair Employment and Housing and requested an immediate right-to-sue notice, which the agency granted on March 30, 2012.  Hilton filed a Complaint with the Equal Employment Opportunity Commission ("EEOC"), by which she made the same allegations of harassment, discrimination, and retaliation in violation of the Title VII of the Civil Rights Act of 1964 (42 USC § 2000e et seq., "Title VII").  On May 31, 2012, the EEOC mailed Hilton's Right to Sue letter.

On August 20, 2012, Hilton filed the Complaint in the instant litigation in federal court. Defendant Twain Harte Community Services District filed the instant Motion for Summary Judgment on April 14, 2014.  The Court had previously issued a scheduling order, which, on June 30, 2014, the Court vacated pending resolution of Defendant's motion.  On April 30, 2014, Hilton filed her Opposition, and attached among numerous other documents, Hilton's affidavit.  The motion is now ripe for consideration.

## LEGAL STANDARD

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine disputed issues of material fact, and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 950 (9th Cir. 2009).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative," the court may grant summary judgment. *Id.* at 249–50 (citation omitted).  At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell,* 547 U.S. 518, 559–60 (2006).

## DISCUSSION

### I.   Exhaustion of Administrative Remedies

Prior to bringing a civil suit on a FEHA cause of action, a plaintiff must exhaust her administrative remedies.  *See Rojo v. Kliger,* 52 Cal.3d 65, 83, 276 Cal.Rptr. 130, 801 P.2d 373 (1990).  Failure to exhaust deprives the court of jurisdiction over a plaintiff's cause of action. *Miller*

*v. United Airlines, Inc.,* 174 Cal.App.3d 878, 890, 220 Cal.Rptr. 684 (1985).  Exhaustion requires

filing a complaint with the DFEH within one year of the date of the alleged unlawful practice. Cal.

Gov't Code § 12960; *see Romano v. Rockwell Int'l, Inc.,* 14 Cal.4th 479, 492, 59 Cal.Rptr.2d 20,

926 P.2d 1114 (1996).  Title VII requires that the initial administrative charge be filed with the

EEOC within either 180 or 300 days following the alleged unlawful employment practice.

Obtaining a so-called "right to sue" letter from one of those agencies is a prerequisite to resorting to

court action. 42 U.S.C. § 2000e–5(f)(1); *Freeman v. Oakland Unified School Dist.,* 291 F.3d 632,

636 (9th Cir. 2002).

The District argues because Hilton failed to file an administrative mandamus action seeking

judicial review of the District's adverse decision, Hilton's failure to exhaust her administrative

remedies precludes her claims for sexual harassment and retaliation.  The District contends that

after internal grievance procedures have commenced, an employee must exhaust her administrative

remedies, regardless of whether she abandons those procedures and obtains a right-to-sue letter.

The District's arguments are unavailing.  While wrongful termination, discrimination, and

retaliation may share a factual basis, they are separate claims.  There is no evidence Hilton

attempted to adjudicate a discrimination or retaliation claim within the scope of the District's

internal grievance procedures.  In its attempt to bar claims ostensibly related to a wrongful

termination cause of action, the District may be conflating the "reasonably related" standard in the

context of filing EEOC or DFEH complaints.  However, the District does not cite to, and the Court

cannot find, case law to support the contention that a plaintiff's discrete claims, albeit tangential to

those addressed in a *Skelly* hearing, are necessarily barred for insufficient exhaustion.

Here, Hilton properly filed a complaint against the District with the California Department

of Fair Employment and Housing and requested an immediate right-to-sue notice, which the agency

granted.  Also, Hilton timely filed a Complaint with the EEOC, by which she made the same

allegations of harassment, discrimination, and retaliation in violation of Title VII, and for which the EEOC granted her a right to sue letter. Finally, Hilton properly filed the Complaint in the instant litigation in federal court, and her claims are distinct from those she pursued through the District's internal grievance process. Accordingly, the Court concludes that Hilton's claims are not barred for failure to exhaust administrative remedies.

## II.   Whether Plaintiff's Claims Are Time-Barred

Before filing a civil suit under Title VII, a plaintiff "must file a charge within the statutory time period and serve notice upon the person against whom the charge is made." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 109 (2002) (citing 42 U.S.C. § 2000e–5(e)); *see also Walsh v. Nevada Dep't of Human Res.*, 471 F.3d 1033, 1038 (9th Cir. 2006) (citing 42 U.S.C. § 12117(a)). Under the FEHA, claims must be filed with the Department of Fair Employment and Housing ("DFEH") within one year prior to filing of a complaint. *See* Cal.*Gov*.Code § 12960(d). To maintain claims under Title VII, Hilton first had to file administrative charges with the EEOC. *See* 42 U.S.C. § 2000e–5(f)(1). "Title VII establishes two potential time limitations periods within which a plaintiff must file an administrative charge with the EEOC." *MacDonald v. Grace Church Seattle,* 457 F.3d 1079, 1081 (9th Cir. 2006) (citing 42 U.S.C. § 2000e–5(e)(1)). "Generally, a Title VII plaintiff must file an administrative charge with the EEOC within 180 days of the last act of discrimination. However, the limitations period is extended to 300 days if the plaintiff first institutes proceedings with a 'State or local agency with authority to grant or seek relief from such practice.'" *Id.* at 1081–82 (citing 42 U.S.C. § 2000e–5(e)(1)). A discrimination charge under Title VII shall also be filed within 300 days of the alleged unlawful employment practice. 42 U.S.C.2000e–5(e); *Gamez–Morales v. Pac. Nw. Renal Serv., LLC,* No. 05–546–AS, 2006 WL 2850476, at *15 (D.Or. Sep. 29, 2006), *aff'd,* 304 Fed.Appx. 572 (9th Cir. 2008). Further, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in

timely filed charges." *Nat'l R.R. Passenger Corp.,* 536 U.S. at 102.  Hilton first instituted

proceedings with a State agency with the requisite authority.  Thus, she had 300 days from the last

act of discrimination to file an administrative charge with the EEOC.

The District argues that Hilton's claims are untimely because behaviors attributed to Spisak

and Bryant are a discrete set of events that required Hilton to file her administrative complaints and

pursue her claims at the time of those incidents.  The District argues that "unless the continuing

violation doctrine applies," the relevant time period for conduct actionable under FEHA is from

March 30, 2011 to March 30, 2012, and, under Title VII, from June 4, 2011 to March 30, 2012, and

the discrete Spisak and Bryant incidents occurred in 2003 and 2009, respectively.  Because the

incidents occurred well before March 30, 2011, and were discrete acts dissimilar to the conduct

which occurred within the limitations period, they are not part of the same actionable hostile work

environment and are time-barred.

In the alternative, the District further argues that if the continuing violation doctrine does

apply, then Hilton knew or should have known that the allegedly hostile work environment had

reached the requisite level of permanence in 2003, or at the latest 2009, when District general

managers informed Hilton that management would take no action to stop Spisak or Bryant's

conduct.  The District argues that statements made to Hilton by the general managers would make

clear to a reasonable employee that any further efforts by Hilton to seek protection from sexual

harassment would be futile.  Thus, even if the doctrine of continuing violation applies, the

cumulative conduct by Spisak and Bryant had reached the requisite level of severity to make out an

actionable hostile environment claim as early as 2003, and at the latest 2009.

The Court disagrees with both arguments.  Undisputed facts show that Hilton timely filed a

DFEH complaint against the District and requested a right-to-sue notice, which was based on the

13

June 17, 2011 termination.  Approximately 287 days later, on March 30, 2012, Hilton obtained a right to sue letter from the DFEH.  Therefore her filing was within the requisite 300 day period.

"Provided that an act contributing to [a hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability," even if "some of the component acts of the hostile work environment fall outside the statutory period." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).  Acts that fall outside the filing period and are unrelated to a timely hostile work environment claim are barred by the timeliness requirement. *Id.* at 118, 122 S.Ct. 2061.  To determine whether the component acts constitute "one unlawful employment practice [the Ninth Circuit] considers whether the earlier and later events amounted to the same type of employment actions, occurred relatively frequently, or were perpetrated by the same managers." *Porter v. Cal. Dept. of Corr.,* 419 F.3d 885, 893 (9th Cir. 2005) (quoting *Morgan,* 536 U.S. at 116, 118, 120, 122, 122 S.Ct. 2061) (internal quotations and alterations omitted).

Hilton specifically complains about continuing behavior within the limitations period by her supervisors, such as Moody and current and former Board members, not discrete acts.  The parties do not dispute that the relevant statutory period began on either March 30, 2011 or June 4, 2011. The evidence shows that Spisak, Bryant, or Moody antagonized Hilton with repetitive behavior that objectively could be described as sexual in nature as late as June 16, 2011, within the limitations period.  Hilton alleges that the event about which she complained on June 16 was similar to other component acts which occurred frequently and were perpetrated by the same managers, and that this conduct contributed to a hostile work environment.  Therefore the Court concludes that the continuing violation doctrine applies.  Moreover, the heart of the case is whether the conduct exhibited during the limitations period by Spisak, Bryant, Moody, and other District managers constitutes sexual harassment and discrimination.

In sum, Hilton filed with the DFEH and EEOC within the limitations period pegged to the alleged unlawful employment practice, obtained the requisite notice of a right to sue, and timely filed her complaint.  For these reasons, the Court concludes that Hilton timely exhausted her administrative remedies and her claims are not time barred.  As fact issues remain, the matter is one for a jury to decide.  Accordingly, the Court denies the District's summary judgment motion as to Hilton's gender discrimination and retaliation claims on this basis.

**III.    Title VII and FEHA Claims**

In the context of a motion for summary judgment in a Title VII action, federal courts apply the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green. McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see, e.g., Dawson v. Entek Intern.,* 630 F.3d 928, 934–35 (9th Cir. 2011).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Celotex,* 477 U.S. at 323.  To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *See, e.g., Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  In resolving a summary judgment motion, evidence of the nonmoving party is to be believed. *Anderson,* 477 U.S. at 255; *see also Matsushita,* 475 U.S. at 587; *see also Johnson v. Rancho Santiago County Cmty. Coll. Dist.*, 623 F.3d 1011, 1018 (9th Cir. 2010).

A plaintiff alleging employment discrimination "need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry-one that is most appropriately conducted by a factfinder, upon a full record." *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1124 (9th Cir. 2000) (internal quotations omitted). The non-moving party only must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v.* Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). The Ninth Circuit has emphasized the importance of "zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1112 (9th Cir. 2004). Though, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 586-87, 106 S.Ct. at 1356 (internal quotations omitted). For the nonmoving party to satisfy her burden, she need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89, 88 S. Ct. 1575, 1592, 20 L. Ed. 2d 569 (1968). If the non-moving party fails to make a sufficient showing, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323, 106 S. Ct. at 2552.

**Claim One: Sexual Harassment and Hostile Work Environment**

Hilton alleges that her workplace at the District was a hostile work environment plagued by sexual harassment in violation of FEHA. Cal. Gov't Code § 19200, *et. seq*.

The District moves for summary judgment on the grounds that the conduct by Spisak and Bryant about which Hilton complains was not sexual harassment, nor was it severe or pervasive,

hence, Hilton's allegations do not constitute an actionable hostile work environment.  Therefore, the District contends, it is not liable for Spisak and Bryant's conduct even if such conduct constitutes severe or pervasive harassment.  The Court addresses these contentions in turn.

To survive summary judgment on a hostile work environment claim based on sexual harassment, Hilton must show that:[2] "(1) she was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." *Porter,* 419 F.3d at 892 (citing *Vasquez v. Cnty. of Los Angeles,* 349 F.3d 634, 642 (9th Cir. 2003)). The working environment must be both subjectively and objectively hostile. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).  Thus, the plaintiff must "subjectively perceive the environment to be abusive," *id.* at 21, and a "reasonable person with the same characteristics as the victim [must also] perceive the workplace as hostile" when considering "the totality of the circumstances," *Craig v. M & O Agencies, Inc.,* 496 F.3d 1047, 1055 (9th Cir. 2007).  "[W]hether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270–71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation marks and citations omitted).  "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady,* 924 F.2d 872, 878

---

[2] Hilton's causes of action for sexual harassment and hostile work environment under Title VII and California's FEHA are based on the same allegations and legal standards .  "[A]lthough the wording of the Federal Civil Rights Act of 1964 . . . differs in some particulars, the antidiscriminatory objectives and the overriding public policy purposes are identical," therefore, California courts refer to applicable federal decisions where appropriate. *Sorosky v. Burroughs*, 826 F.2d 803 (9th Cir. 1987) (citing *Cnty. of Alameda v. Fair Employment & Hous. Com.*, 153 Cal.App.3d 499, 504, 200 Cal.Rptr. 381 (1984); *Miller v. Dept. of Corr.*, 36 Cal.4th 446, 463, 30 Cal.Rptr.3d 797, 115 P.3d 77 (2005); *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000)).

1   (9th Cir. 1991).  Sexual harassment includes "unwelcome sexual advances, requests for sexual

2   favors, and other verbal or physical conduct of a sexual nature that has the 'purpose or effect of

3   unreasonably interfering with an individual's work performance or creating an intimidating, hostile,

4   or offensive working environment.'"*Miller,* 36 Cal.4th at 463, 30 Cal.Rptr.3d 797, 115 P.3d 77

5   (*quoting*29 C.F.R. § 1604.11(a)(3)).  Finally, an employer is liable for the harassment where the

6   employer "or its agents or supervisors, knows or should have known of [the harassing] conduct and

7   fails to take immediate and appropriate corrective action." Cal. Govt. Code § 12940(j)(1).

8        The District fails to demonstrate the absence of a genuine issue of fact for trial.  As in

9   *Porter,* "the record contains sufficient evidence to permit an inference" that the employee-

10  plaintiff's supervisors created a sexually hostile environment that began in 2003 and persisted until

11  June 2011. 419 F.3d at 894.  In *Porter,* the Ninth Circuit reversed the district court's grant of

12  summary judgment based on a finding that plaintiff's hostile work environment claim was time

13  barred.  As here, the *Porter* plaintiff received unwanted advances before the limitations period and

14  then was subjected to "derogatory" remarks and the same "type of sexist activity" after the

15  limitations period, such as conduct "intimidating or demeaning the value of female employees who

16  do not submit to demands for sexual favors." *Id.* at 894.  Specifically, before the limitations period,

17  the *Porter* plaintiff's harassers "sexually propositioned her and made offensive comments about

18  her," *id.* at 893; sometime during the limitations period they "glared at [her] in an intimidating

19  fashion" and referred to her as a "fucking bitch." *Id.*

20       Hilton has submitted evidence that she received unwanted sexual advances before the

21  limitations period and then was subjected to derogatory remarks and the same type of harassing

22  behavior after the limitations period.  Specifically, before the limitations period Hilton rejected

23  unwanted sexual advances from District Board member Spisak and withstood derogatory remarks

24  and sexist activity by District Board members Spisak, Bryant, and her supervisors including

18

Moody.  Evidence exists that Spisak and Bryant continued their aggressive and antagonistic conduct, materially similar to their behavior before their respective resignations from the District Board.  Spisak followed Hilton in the District parking lot, attempted on numerous occasions to engage Hilton in unwanted contact, intimidated her by rapping on her window, and Hilton's facts are that this pattern of behavior continued until the day before the District fired her.  As described by Hilton, the historical pattern of Spisak's behavior was to suggest and instigate intimate and sexual relations with her.  Bryant also continued to antagonize Hilton at her place of business although he had been asked as part of his resignation agreement to stay away from her upon findings by the District investigator that Bryant had discriminated against Hilton.

Whether the continued unwanted attentions at issue constitute conduct of an objectively sexual nature is a factual issue for a jury to decide.  A trier of fact could reasonably find that the repeated conduct by Spisak and Bryant was perpetuated by the same actors, was sexually aggressive or discriminatory in nature, was repetitive and unwelcome, and that the District failed to protect Hilton from that conduct.  Consequently, a jury could find that, as in *Porter*, the "alleged verbal and physical conduct was of an unwelcome sexual nature and, when taken together as a whole, it was sufficiently severe *and* pervasive to create an abusive work environment." 419 F.3d at 894 (emphasis in original).  The Court cannot say if every person might perceive the alleged conduct in that manner, but when viewing the facts in a light most favorable to Hilton, it is not correct to say that no reasonable person would.  "In close cases . . ., where the severity of frequent abuse is questionable, it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment." *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1096 (9th Cir. 2008).  This is such a case.

Accordingly, Hilton has established a timely prima facie case of hostile work environment based on sexual harassment spanning from 2003 through 2011.  The Court declines to grant

summary judgment on grounds that a fact issue remains whether the relevant conduct rose to the level required to sustain a hostile work environment claim.

The Court's inquiry does not end there because supervisors with the authority to control the environment may be held liable for harassment in violation of FEHA if they tacitly approved of the actions or if they were aware of the harassment and failed to take action to prevent it. *Matthews v. Superior Court,* 34 Cal.App.4th 598, 604, 40 Cal.Rptr.2d 350 (1995).

> Unlike discrimination in hiring, the ultimate responsibility for which rests with the employer, sexual or other harassment perpetrated by a supervisor with the power to hire, fire and control the victimized employee's working conditions is a particularly personal form of the type of discrimination which the Legislature sought to proscribe when it enacted the FEHA. Our holding that the responsibility for such acts must be borne both by the offender as well as the employer who tolerates the offense is consistent with the Legislature's intent to provide effective remedies which will eliminate such discriminatory practices.

*Id.* at 605–06, 40 Cal.Rptr.2d 350 (internal quotations omitted).   In other words, where the harassment is committed by a supervisor, the employer is strictly liable. *State Dep't of Health Servs. v. Superior Court,* 31 Cal.4th 1026, 1041, 6 Cal.Rptr.3d 441, 79 P.3d 556 (2003); *Monaghan v. El Dorado Cnty. Water Agency,* 2:10-CV-00434-MCE, 2012 WL 397769 (E.D. Cal. Feb. 7, 2012).   Thus, if Hilton's supervisors knew about and tolerated conduct that constituted harassment, or if they tacitly approved of the actions, then the District is strictly liable.

The District concedes that Hilton's supervisors, like Moody and members of the 2011 Board, knew about Hilton's allegations of sexual harassment and discrimination.   The District agrees that it investigated the Board Members' conduct about which Hilton complained in 2003 and 2009, and concluded that Hilton's grievances had merit.   The District also concedes that Hilton's District supervisors knew she had lodged complaints between 2009-2011.   Further, the District concedes that despite Hilton's frequent complaints about the District's ineffectual remedies – up to and including her complaints in June 2011 – it took no preventative or remedial action.   Indeed, in its brief the District emphasizes it took no preventative or remedial steps to address Hilton's

grievances.  Instead, the District contends that its managers were powerless to arrest the offending conduct because the District office is a public building.  Public buildings are no shield against sexual harassment laws and a building's public status does not preclude remedial action.[3]  The record shows that Hilton's supervisors had at least one alternative remediation measure available other than barring entry to the building.  Timoney offered to lead free sexual harassment training for the District, but District management declined.

A reasonable juror could find the District's failure to take remedial action during the relevant period was inappropriate, inadequate, and emboldened the harassers to continue their misconduct with the District's tacit approval.  A trier of fact could find that by their inaction District managers adopted the offending conduct and, as Hilton's supervisors, are strictly liable for it; or, alternatively, that Hilton's supervisors' conduct standing alone constitutes harassment, and with the same result.

Viewing the evidence in a light most favorable to the plaintiff, the Court cannot as a matter law conclude that Hilton had not been subjected to severe or pervasive harassment in contravention of FEHA.  As genuine issues of material fact persist, Hilton has met her burden to establish a prima facie case of a hostile work environment claim based on sexual harassment.  The Court will deny the District's motion for summary judgment on Hilton's hostile environment claim under FEHA.

//

---

[3] FEHA prohibits employers from "fail[ing] to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov't Code § 12940(k).  Section 12940 is a statutory tort that requires a plaintiff to demonstrate a defendants' duty towards a plaintiff, breach of that duty, causation, and damages to the plaintiff. *Trujillo v. N. Cnty. Transit Dist.,* 63 Cal.App.4th 280, 286–87, 73 Cal.Rptr.2d 596 (1998).  Reasonable steps include promptly investigating discrimination claims, implementing anti-discrimination policies in the workplace, and putting a system in place to address discrimination claims. *Cal. Fair Employment & Housing Comm'n,* 122 Cal.App.4th at 1024–25.  It is the employer-defendants burden to demonstrate that it took such steps to address or prevent discrimination. *Washington v. Cal. City Corr. Ctr.,* 871 F.Supp.2d 1010, 1027 (E.D.Cal. 2012).

**Claim Two: Gender Discrimination**

The District similarly fails to demonstrate the absence of a genuine issue of fact for trial as to Hilton's gender discrimination claim.

A.  Prima Facie Case of Discrimination

To establish a Title VII violation for discrimination an employee must first show that: (1) she belongs to a protected class; (2) she was qualified for his position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably.  *McDonnell Douglas Corp.,* 411 U.S. at 802; *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1089 (9th Cir. 2008).

1.  Protected Class

For the purposes of this motion, the parties do not dispute that Hilton is a female.  Gender is a protected classification. 42 U.S.C. § 2000e–2(a).

2.  Qualified

The parties do not dispute whether Hilton was qualified for her position at the time she was hired.  Because Hilton was promoted to the position of Finance Manager in 2008, and remained in this job until her termination, a reasonable jury could find that she was qualified for her position.

3.  Adverse Employment Action

In a Title VII discrimination action, adverse employment actions are those that materially affect compensation, terms, condition or privileges of employment. 42 U.S.C. § 2000e–2(a); *see, e.g., Rodriguez v. Pierce County,* 267 Fed. Appx. 556, 557 (9th Cir. 2008); *see also Moran v. Selig,* 447 F.3d 748, 754 (9th Cir. 2006).  Termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion are examples of adverse employment actions. *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000).

Hilton's discrimination claims are based on her termination and the District's subsequent nonpayment of accumulated benefits.  A reasonable jury could find that both are adverse employment actions.

> 4.   Similarly Situated Individuals Outside Protected Class Treated More Favorably

Whether two employees are similarly situated is ordinarily a question of fact.  *Beck v. United Food & Commercial Workers Union Local 99,* 506 F.3d 874, 885 n. 5 (9th Cir. 2007). Individuals are similarly situated when they have similar jobs and display similar conduct. *Vasquez v. County of Los Angeles,* 349 F.3d 634, 641 (9th Cir. 2003).  "The employees' roles need not be identical; they must only be similar 'in all material respects.' "*Hawn v. Exec. Jet Mgmt. Inc.,* 615 F.3d 1151. 1157 (9th Cir. 2010) (*quoting Moran v. Selig,* 447 F.3d at 755).  Materiality depends on the context and the facts of the case. *Earl v. Nielsen Media Research, Inc.,* 658 F.3d 1108, 1114 (9th Cir. 2011); *Hawn,* 615 F.3d at 1157.

It is undisputed that during the relevant period Hilton was the District's Finance Manager and had held the position since 2005.  It is undisputed that the District fired other management-level employees in 2011, some shortly before Hilton's termination.  The parties do not dispute that terminated employees such as the operations manager, the Fire Chief, and the Finance Manager were all management-level employees.  The other terminated management-level employees are all male.  Hilton is female.

Hilton alleges disparate treatment of the male and female terminated managers.  The District paid the terminated male managers vacation and accumulated sick pay and gave them a severance package.  In one instance, a terminated male manager, McCoy, had eight months from the date of his termination to become fully vested in the CalPERS retirement plan ("CalPERS").  Despite the District's firing him on the basis of his serious unethical misconduct, the District tailored a severance plan such that he could successfully comply with CalPERS requirements.  To another

male management-level employee not close to retirement, the District gave the option to accept a demotion rather than get fired, a deal substantively similar to McCoy's. However, the District did not offer Hilton any similar option, although the District had not accused her of misconduct and she had only six months from the date of her termination before she would become fully vested in CalPERS. Also, whereas upon termination all of the male managers received pay for accumulated sick time and vacation days, Hilton was not similarly compensated.

As a question of fact, a reasonable jury could find that Hilton and the other management-level employees are similarly situated. A reasonable jury could find in Hilton's favor for each of the required elements. Consequently, a question of material facts exists as to whether Hilton can demonstrate a prima facie case for gender discrimination. The burden thus shifts to Defendants.

B.  Whether Legitimate Nondiscriminatory Reasons for Adverse Action Exist

Title VII was not intended to diminish "traditional management prerogatives." *Steelworkers v. Weber,* 443 U.S. 193, 207, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). "When the plaintiff has proved a prima facie case of discrimination, the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions." *Id.* at 260.

Defendants assert that they had legitimate nondiscriminatory reasons for firing Hilton and not offering any severance. The District first contends that its termination decision was based on Hilton's management style as well as the grievances and complaints the District had received about Hilton from Board members and customers. The Court is unconvinced. During Hilton's ten years employed at the District, the District had promoted her on at least two occasions. Her management style, for at least some period of time, was apparently successful. Other than the conflict over the gender discrimination and sexual harassment issues, the District does not point to specific instances where her management style was inadequate, other than making conclusory statements. The facts before the Court are that Board members' complaints about Hilton were relative to her tendency to

24

complain about harassment or discrimination.  If, as the District argues, Board members' and employees' complaints compelled the Board to terminate Hilton, the fact question remains whether these complaints stemmed from Hilton's protected activity.  The District fails to elaborate, cutting against its argument that its justification is legitimate.  A trier of fact could reasonably conclude that the given justifications are not legitimate.

The District also argues that it had nondiscriminatory reasons for not offering Hilton a severance package or other benefit payments.  As justification, the District argues that it lacks policy on automatically granting severance packages to terminated employees.  Notwithstanding silence on an issue, if management uses lack of policy as justification to deny taking some action, that itself is a policy.  But in practice, the District's lack of policy did not preclude the District from giving severance packages to at least some terminated employees.  The District concedes that it considered giving Hilton a severance package but after some deliberation decided against.  The possibility remains that the District could have decided that it would grant Hilton a severance, as it did for others.  Had the nonexistence of severance policy actually driven the decision, there would have been nothing to deliberate.  Because the District offers no other justification – nondiscriminatory or otherwise – the Court finds that the District has failed to explain a nondiscriminatory reason that the District gave a severance package to its terminated male management-level employees, but not Hilton.

The Court concludes that the District has not met its burden to explain nondiscriminatory reasons for its actions.  Assuming, *arguendo*, that they have met this burden, the Court will next consider whether Defendants' proffered reasons are a pretext for discrimination.

C.  Pretext

Considering the relatively low bar for a plaintiff alleging employment discrimination to survive summary judgment together with the relatively high bar for the same plaintiff to offer

specific and substantial circumstantial evidence to demonstrate that her employer's proffered

legitimate, nondiscriminatory reasons for the adverse employment action were a pretext for

discrimination, the Court considers Plaintiff's evidence of pretext.  The third step of the *McDonnell*

*Douglas* analysis places a higher burden on the plaintiff than at the prima facie stage.  *Hawn v.*

*Exec. Jet Mgmt.,* 615 F.3d at 1158 ("a plaintiff's burden is much less at the prima facie stage than at

the pretext stage.").  A plaintiff may demonstrate pretext in either of two ways: (1) directly, by

showing that unlawful discrimination more likely than not motivated the employer; or (2)

indirectly, by showing that the employer's proffered explanation is unworthy of credence because it

is internally inconsistent or otherwise not believable. *Chuang v. Univ. of Cal. Davis,* 225 F.3d at

1127; *Burdine,* 450 U.S. at 256.

        With direct evidence, a triable issue as to the actual motivation of the employer is created

even if the evidence is not substantial.  *Chuang,* 225 F.3d at 1128 (citations omitted). "[V]ery little"

direct evidence[4] is required to raise a genuine issue of material fact.  *Coghlan v. Am. Seafoods Co.,*

413 F.3d 1090, 1095 (9th Cir. 2004) (*quoting Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221

(9th Cir. 1998)).  Direct evidence of pretext refers to evidence that proves the fact of discriminatory

animus and is typically in the format of discriminatory statements or actions. *Id.* at 1095, 1095 n. 8.

For example, two items of direct evidence found in *Chuang* "easily clear[ed] this threshold" – a

member of the decision-making body reportedly stated in a meeting that two [derogatory phrase

referring to Asians] were "more than enough," and a department chairman told plaintiffs that they

should pray to Buddha for help. *Chuang*, 225 F.3d at 1128.

        At the summary judgment stage after a prima facie case and legitimate nondiscriminatory

reasons are accepted, Hilton must demonstrate a triable issue of material fact that the District

---

        [4] In light of the direct evidence, the Court need not review the Plaintiff's indirect evidence.
Although the Court notes that Hilton has raised sufficient indirect evidence, *supra*, to raise a triable
issue of pretext for discrimination. *See Coghlan,* 413 F.3d at 1095.

discriminated against her on the basis of her gender.  In a discrimination action, the Court cannot find a triable issue of discrimination without any specific or substantial evidence of sex discrimination in the District's decision.  Hilton suggests that her supervisors – Moody and the District's Board members – were motivated to fire her because of her protected activity complaining about sexual harassment and gender discrimination.  By itself, the temporal proximity of Hilton's complaint about Spisak to Moody on the morning of July 17, 2011, just hours before Moody fired her, is enough to support Hilton's claim.  Yet Hilton further proffers that Moody had previously directly threatened her job as a result of her protected conduct when he told her that if she continued complaining about gender discrimination she should be aware that a director "might" tell Moody to "write a check for any sum of money to get rid of [her]."  Therefore, the Court finds that Hilton manifests sufficient evidence that the District had a discriminatory motive or intent behind its adverse employment actions sufficient to prevent summary judgment.

The Court finds that the evidence, when taken in the light most favorable to Hilton, implies that Hilton was terminated and not given severance because of discriminatory animus.  Hilton has met her burden to demonstrate that that the District's proffered reasons lack credence, and that the lack of credence supports an inference of pretext.  Taken together, the factual allegations could give rise to the inference that the true reason Hilton was terminated was on the basis of her gender.  Accordingly, the Court concludes that Hilton has offered evidence of bias, motive or intent sufficient to prevent summary judgment.

In sum, the Court finds that Defendants fail to meet their burden of demonstrating a nondiscriminatory explanation for their behavior.  Even assuming, *arguendo*, that the District met its burden, the Court concludes that Hilton successfully rebuts the argument with sufficient evidence to create a triable issue of fact with respect to her discrimination claim.  Accordingly, the Court will deny the District's motion as to this claim.

**Claim Three: Retaliation**

Claims for retaliation under FEHA also follow the *McDonnell Douglas* burden-shifting framework. *Yanowitz v. L'Oreal USA,* 36 Cal.4th 1028, 1042, 32 Cal.Rptr.3d 436, 116 P.3d 1123 (Cal. 2005). Here again, the District fails to demonstrate the absence of a genuine issue of fact for trial as to Hilton's retaliation claim.

To establish a prima facie case of employment discrimination based on retaliation, the employee must show (1) that she engaged in a protected activity; (2) she was subsequently subjected to an adverse employment action; and (3) that a causal link exists between the two. *Dawson v. Entek Int'l,* 630 F.3d 928, 936 (9th Cir. 2011); *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1093–94 (9th Cir. 2008). If plaintiff establishes a prima facie case, the burden of production shifts to defendants to show a "legitimate non-retaliatory" reason for taking the adverse employment action. *Id.* If defendants meet that burden, plaintiff must then raise a genuine issue of material fact suggesting that defendants' legitimate non-retaliatory reason is pretextual. *Id.*

The District does not challenge that Hilton engaged in a protected activity or that she was subsequently subjected to an adverse employment action. Prongs one and two are not at issue. However, the District disputes that there is a causal link between the adverse employment action and Hilton's protected activity on June 17, 2011. Hilton argues that because she was fired only a few hours after filing an internal complaint about discrimination, the close temporal proximity suggests a causal connection between her grievance and the fact she was terminated.

As only the third prong is in dispute, the Court thus proceeds. Until recently, the causal link element of a retaliation case was construed very broadly so as to require a plaintiff to prove only that the protected activity was a motivating factor of the adverse action at the prima facie stage. *Poland v. Chertoff,* 494 F.3d 1174, 1180 n. 2 (9th Cir. 2007) (quotation omitted); *Head v. Glacier Northwest, Inc.,* 413 F.3d 1053, 1065 (9th Cir. 2005). However, in 2013, the Supreme Court held

that Title VII retaliation claims "must be proved according to the traditional principles of but-for

causation." *University of Texas Southwestern Medical Ctr. v. Nassar*, —— U.S. ——, ——, 133

S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013). This means that a plaintiff must show that the unlawful

retaliation would not have occurred in the absence of the employee's protected activity.

Causation may be inferred from circumstantial evidence, including the proximity in time

between the employer's knowledge that the plaintiff engaged in protected activity and the allegedly

retaliatory employment decision. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d at 1035;

*Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1065 (9th Cir. 2002). "But timing alone will

not show causation in all cases; rather, in order to support an inference of retaliatory motive, the

[adverse employment action] must have occurred fairly soon after the employee's protected

expression." *Id.* (internal quotations omitted).

A plaintiff may demonstrate causation through temporal proximity alone when a sufficiently

short time elapsed after the protected activity. *Washington,* 971 F.Supp.2d at 1029. Courts have

held that a time lapse of nearly six months between the protected activity and the adverse

employment action, on its own, is insufficient to show causation. *Cf. Villiarimo,* 281 F.3d at 1065

(examining case law in which time lapses of four or five months were insufficient). Here, the short

period of time between Hilton's complaint to her supervisor and his decision to fire her the same

day is sufficient to establish a prima facie case on summary judgment.

The District counters that there is no causal link because it has a legitimate, non-

discriminatory reason for terminating Hilton and it had no severance policy. Notwithstanding the

District's assertion that Hilton's incompatible management style is a legitimate, nonretaliatory

reason for firing her without a severance package, Hilton has raised a question of fact, *supra*, as to

whether this asserted reason was pretextual.

"To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Washington v. Cal. City Corr. Ctr.,* 871 F.Supp.2d 1010, 1028–29 (E.D.Cal. 2012) (quoting *Co hen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir. 1982)) (internal quotations omitted); *Cal. Fair Employment & Hous. Comm'n v. Gemini Aluminum Corp.,* 122 Cal.App.4th 1004, 1020, 18 Cal.Rptr.3d 906 (2004).

In addition to the temporal proximity, Hilton enumerates specific incidents where she perceived harassment and a pattern and practice of gender discrimination.  Hilton contends it was the District's dissatisfaction with her continued complaints that served as its motivation for the adverse employment action.  Evidence supports that Hilton frequently complained about her treatment at the hand of the Board.  For example, Board members expressed discontent with how Hilton communicated with male supervisors on finance issues despite her role as Finance Director and directed Moody to tell Hilton that, unless spoken to, she should not speak at Board meetings. Moody also told Hilton that to speak at Board meetings she was required to raise her hand, though male managers were not required to do so.  In one instance, Hilton was asked to leave a finance meeting.  When Hilton complained, Moody explained it was "so the men could talk."  After these and other incidents, Hilton complained to her supervisor.  Hilton alleges that the District's desire to quash her complaints of sexual harassment and discrimination spurred her supervisors to strongly suggest her silence.  On one occasion after Hilton had sent an email including a directive related to her supervisory responsibilities, Moody warned Hilton that she should "be careful of Gordon [Malloy, a Board member]. He doesn't like to be told what to do by a woman."  On another occasion at a Board meeting, a Board member interrupted Hilton and spoke over her, while another Board member gestured at her to "shut up" by slicing his finger across his neck.  Evidence shows that Hilton did not silence herself.  Hilton contends that the District's pattern of threatening her job

in the wake of her complaints demonstrates that the District finally realized its plan to fire her based on her protected behavior.

The Court concludes that the facts as alleged by Hilton are sufficient to infer causation for the retaliation action.  A trier of fact could reasonably infer causation from the close temporal proximity between Hilton's internal complaint and her firing, taken together with the direct and indirect evidence of a retaliatory motivation.  Accordingly, the Court declines to grant Defendants' summary judgment on this claim.

**IV.     CONCLUSION AND ORDER**

Accordingly, based on the foregoing**, IT IS HEREBY ORDERED** that Defendant's "Motion for Summary Judgment / Adjudication" (Doc. 29), is **DENIED**.


IT IS SO ORDERED.

Dated:   **August 28, 2014**                          **/s/ Sandra M. Snyder**
                                                    UNITED STATES MAGISTRATE JUDGE